633 F.2d 964
 17 ERC 1070, 11 Envtl. L. Rep. 20,004
 Wilfredo Marquez COLON et al., Plaintiffs, Appellees,
v.
James E. CARTER, President, etc., et al., Defendants, Appellants.
COMMONWEALTH OF PUERTO RICO, Plaintiff, Appellant,
v.
Edmund S. MUSKIE et al., Defendants, Appellees.
Wilfredo Marquez COLON et al., Plaintiffs, Appellants,
v.
James E. CARTER, President, etc. et al., Defendants, Appellees.
 Nos. 80-1665, 80-1666 and 80-1667.
 United States Court of Appeals,
First Circuit.
 Argued Oct. 21, 1980.
Decided Oct. 24, 1980.
 
 Peter R. Steenland, Jr., Atty., Dept. of Justice, Washington, D.C., with whom Lois J. Schiffer, Donald W. Stever, Jr., Richard Lazarus, Atty., Policy, Legislation and Special Litigation Section, Land & Natural Resources Division, U.S. Dept. of Justice, Washington, D.C. and Dorothy Burakreis, Attys., Dept. of Justice, Washington, D.C., were on brief for James E. Carter, President of The United States of America, et al.
 Michael J. Henke, Washington, D.C., with whom Richard G. Wilkins, Vinson & Elkins, Washington, D.C., Gerardo A. Carlo, and Miguel A. Gimenez Munoz, Secretary of Justice, Commonwealth of Puerto Rico, San Juan, P.R., were on brief, for the Commonwealth of Puerto Rico.
 Pedro Saade Llorens, Hato Rey, P.R., with whom Pedro J. Varela, Hato Rey, P.R., was on brief, for Wilfredo Marquez Colon, et al.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 COFFIN, Chief Judge.
 
 
 1
 These three appeals from a partial preliminary injunction require us to consider the legality of the federal government's efforts to relocate a number of Cuban and Haitian refugees from their present facilities in Florida to Fort Allen, Puerto Rico. Plaintiffs are the Commonwealth of Puerto Rico and several individual residents of a municipality near the Fort (hereafter collectively "the Commonwealth"). Defendants are President Carter, Secretary of State Muskie, Secretary of Defense Brown, and various other government officials said to be involved in the relocation program (hereafter collectively "the government").
 
 
 2
 After an expedited hearing, the district court on October 8, 1980 issued a preliminary injunction restraining the government from "taking any further action, of all natures, for the purpose of transferring refugees to Fort Allen" until an environmental impact statement (EIS) had been prepared in conformity with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(C). On October 10, 1980, President Carter signed into law the Refugee Education Assistance Act of 1980, Pub.L. No. 96-422 (REAA), section 501(c) of which exempted action furnishing "assistance ... for the processing, care, maintenance, security, transportation, and initial reception and placement in the United States of Cuban and Haitian entrants" from the EIS requirement of NEPA. Presented with the new statute by the government later that same day, the district court set aside its injunction "as to any new construction in Fort Allen pursuant to the new legislation", but continued its injunction against the transfer of refugees to Fort Allen. Each party has taken an appeal from that order, and each has sought highly expedited review, which has been granted. While motions from each side sought relief pending decision on appeal, the ultimate issues on the merits of the preliminary injunction were both briefed and argued. We consider each appeal in turn.
 
 
 3
 The Commonwealth's appeal argues that the NEPA exemption contained in Title V of the REAA is inapplicable to the proposed transfer of refugees to Fort Allen for two independent reasons: first that the term "United States" as used there does not include Puerto Rico, and second that the term "Cuban and Haitian entrants"-a term which the Commonwealth interprets to include only refugees entering the United States prior to June 19, 1980-would not apply to some or all of the refugees to be transferred to Fort Allen.[1] We find each of these grounds unpersuasive. The first is contravened by the import of section 501(a)(1) of the REAA, which authorizes the President to exercise authorities with respect to Cuban and Haitian entrants identical to those exercised under the Immigration and Nationality Act, which in turn explicitly defines the term "United States" to include Puerto Rico. 8 U.S.C. § 1101(a) (38).[2] The second we think simply a hypertechnical reading of Title V, which is both generally at odds with the central purpose of Title V and specifically inconsistent with the purpose of providing an EIS exemption. That Title V generally is not limited to Cuban and Haitian refugees entering prior to June 19, 1980 is demonstrated both by its provision for "initial reception" assistance in section 501(c), since refugees entering before June 19 had already been initially received by October 10, and by its inclusion of refugees to be accorded yet-undetermined status classifications in section 501(e)(1)-a provision apparently looking to the future. That its NEPA exemption specifically is not limited to actions assisting such entrants is evident from the very nature of that exemption: it simply makes no sense whatsoever to condition an EIS exemption on a factor so completely irrelevant to environmental impact. Thus, we conclude that the NEPA exemption contained in Title V of the REAA is applicable to the transfer of refugees to Fort Allen,[3] and we decline to reinstate the injunction against continued construction there.[4]
 
 
 4
 The government's appeal argues that the executive order designating Fort Allen as a relocation site is not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. We agree, on the ground that the decision is one committed to the President's discretion by law and therefore unreviewable under 5 U.S.C. § 701(a)(2).[5] Although "we will not lightly interpret a statute to confer unreviewable power ... the ultimate analysis is always one of Congress' intent." Southern Railway Co. v. Seaboard Allied Milling Corp., 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979). We have previously addressed this analysis as follows:
 
 
 5
 "In approaching this question, we recognize a strong presumption in favor of review, which is overcome only by 'clear and convincing evidence' that Congress intended to cut off review .... Such evidence may, however, be drawn not only from explicit language, but also from a statute's purpose and design.... In the absence of a clear declaration of Congressional intent, three factors seem to us determinative: first, the appropriateness of the issues raised for review by the courts; second, the need for judicial supervision to safeguard the interests of the plaintiffs; and third, the impact of review on the effectiveness of the agency in carrying out its assigned role." Hahn v. Gottlieb, 430 F.2d 1243, 1249 (1st Cir. 1970).
 
 
 6
 We conclude that in this case, as in Southern Railway, " 'there is persuasive reason to believe that (nonreviewability) was the purpose of Congress.' " Id., quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 Ed.2d 681 (1967).
 
 
 7
 The explicit language of the REAA provides one strand of evidence of nonreviewability: section 501(c)(1)(A) provides that "assistance shall be provided on such terms and conditions as the President may determine." In addition, the three factors identified in Hahn as relevant in the absence of clear Congressional intent seem satisfied here. First, the determination that a President must make prior to issuing an exemption from the relevant environmental regulations is that the "paramount interest of the United States" requires the exemption. See 33 U.S.C. § 1323(a); 42 U.S.C. §§ 4903(b), 6961, 7418(b). It is difficult to imagine a determination more fully committed to discretion or less appropriate to review by a court. Second, Congress has directed the President to report to it annually on all exemptions granted under each environmental statute during the preceding year together with his reasons for granting them. See 33 U.S.C. § 1323(a); 42 U.S.C. §§ 4903(b), 6961, 7418(b). While this supervision does not provide the immediate protection that the Commonwealth seeks, it does evince a congressional intent to review the President's decisions and safeguard the environmental interests at stake itself. Finally, we believe that judicial review of a decision such as the one involved here could impair the President's effectiveness in carrying out his assigned responsibilities. This likelihood, of course, is especially significant where as here a situation demands prompt and efficient action to cope with an emergency. Thus, we think on balance that this decision is appropriately found to be one committed to the President's discretion by law.[6]
 
 
 8
 For all the foregoing reasons, we conclude that the Commonwealth has failed to demonstrate a sufficient probability of success on the merits to justify the issuance of a preliminary injunction.[7] In announcing this conclusion, we deem it appropriate to note that we consider significant representations as to the relocation program made by the government in its papers and at argument: that no more than 2000 refugees are expected to be transferred to Fort Allen, that adequate sewage treatment facilities would be guaranteed, and that adequate security would be provided to ensure the safety of nearby residents, among others. We would expect the government to adhere fully to these representations throughout the implementation of the transfer.
 
 
 9
 In accordance with this opinion, we have issued an order directing that the motion to reinstate the injunction against further construction at Fort Allen be denied and that the injunction against the transfer of refugees to Fort Allen be vacated.
 
 
 10
 So ordered.
 
 
 
 [1]
 At oral argument the Commonwealth raised a claim that the REAA exemption extends only to NEPA's EIS requirements and not to other NEPA requirements which were also allegedly violated. Because this issue was not presented in the briefs we do not consider it. We add that we see no manifest injustice occurring by reason of our refusal to consider this argument
 
 
 [2]
 Because of our conclusion on this point, we do not reach the question whether under relevant precedent Puerto Rico is presumptively included, as the government contends, or presumptively excluded, as the Commonwealth contends, by the term "United States"
 
 
 [3]
 This conclusion makes it unnecessary for us to consider the government's argument that the Disaster Relief Act, 42 U.S.C. § 5121 et seq., also provides an exemption to the EIS requirement for the Fort Allen relocation program
 
 
 [4]
 The Commonwealth urges that the injunction was independently warranted by violations of both the National Historic Preservation Act, 16 U.S.C. § 470 et seq., and the Coastal Zone Management Act, 16 U.S.C. § 1451 et seq. Because the district court did not rule on or make any findings of fact in connection with these claims, we decline to address them here
 
 
 [5]
 Our holding on this ground assumes without deciding that the President is in fact an "agency" within the meaning of the Administrative Procedure Act. Because the commitment of the decision to the President's discretion in this instance is clear, we do not consider either that question or the government's argument that this Presidential action presents nonjusticiable questions of foreign policy or national security
 
 
 [6]
 The Commonwealth argues that even if we make such a finding we should review this decision both because it is patently arbitrary and because it violates Constitutional protections. We believe the first of these fails to recognize the essence of a holding of nonreviewability; we do not reach the second because no specific constitutional violations are even alleged in the papers before us
 
 
 [7]
 This conclusion dictates that we need not address other prerequisites to the issuance of a preliminary injunction-the likelihood of irreparable harm, the balance of the equities, and the public interest